The final case on for argument today is Ronnie Van Zant, Inc. v. Cleopatra Records, Inc. Let's just wait for some folks to clear out, and then we can give you our full attention. Thanks, Mr. Mandel. Thank you, Your Honor. My name is Evan Mandel, and I represent Cleopatra in this matter. This is an appeal of a gag order that prohibits my client, Cleopatra, from publishing a film. We don't believe that Mr. Pyle waived his First Amendment rights. We don't believe that Cleopatra acted in concert with Mr. Pyle. And we don't believe that our film violates the consent decree. However, even if all three of those things are true, the injunction in this case is still an unlawful prior restraint. The First Amendment permits prior restraints only in the most extraordinary of circumstances. And the district court did not find, and plaintiffs do not argue, that those extraordinary circumstances are present in this case. The types of extraordinary circumstances that would warrant a prior restraint are an immediate and irreparable harm to national security. The plaintiffs are not arguing that that is present in this case, and Judge Sweet did not make any effort to find whatsoever that such an extraordinary issue or harm is at issue in this case. Instead— I appreciate this is a contract case and not a copyright case, but haven't we enjoined the publication of materials deemed— when we had galley proofs that were deemed to infringe copyright without finding that it was up there with the Pentagon Papers? That's exactly right, Your Honor. The copyright prior— Is that different from contract? It's completely different, Your Honor. Why? Well, copyright is in the Constitution, and the First Amendment analysis is completely different in the copyright context than it is in non-copyright speech. Have courts said that when they've issued injunctions or upheld copyright injunctions? Courts have said that. I believe Justice Brennan's decision in the Pentagon Papers case talks about how the analysis is totally different in the copyright context, and I believe that in one of the amici's briefs in a footnote— I don't recall the exact number of the footnote, but they explain there's essentially two reasons why the analysis is totally different in the copyright context, and they cite cases in connection with it. One is the idea-expression distinction. Because copyright doesn't ever prohibit anyone from sharing an idea, it only prohibits people from copying an expression, it doesn't threaten speech. In contrast, the restraint in this case prohibits Mr. Pyle and anyone who has apparently received information or worked with Mr. Pyle from talking about the band. If you win on this argument, which you've turned to first, and depending on what happens with the other arguments, you may just get a remand for a damage hearing. It's not so. If you just tell us the ultimate defect here is an injunction, which the First Amendment prevents, you get a damage hearing. They get a damage hearing. Sure. I'll disagree with that in two ways. First, the original consent decree in this case is an unlawful prior restraint. Oh, I see. You're saying they would not even get a damage hearing. That's correct. In order to get a damage hearing, they would have to establish that the consent decree as originally issued was a legal prior restraint. And the consent decree is an order that prohibits anyone from acting in concert with any of the signatories to the consent decree from engaging in speech. That is a naked prior restraint. And in this court's decision in Crosby, the court vociferously rejected any such restraint. That's premised entirely on the consent of the parties. Are nondisclosure agreements in violation of the First Amendment? No. I mean, there's nothing – They prevent a lot of speech beforehand, don't they? They absolutely do. A nondisclosure agreement is a totally separate issue. There's no state action with respect to a nondisclosure agreement. Two private parties enter into a – It's not too far-fetched to think that they might be disputed and a court might say this nondisclosure agreement is valid and enforceable. Would that make it a First Amendment violation? I think the court would have to go through two separate analyses to answer that question. The first is they'd have to go through the prior restraint analysis. Is there a sufficient extraordinary interest, such as an immediate threat to national security, that warrants an injunction in that case? How about noncompete clauses that say if you go to another competing company, don't reveal any proprietary information? Are there restraints if a court enforces them? Sure. I mean, the noncompetes can be written in different ways, and certainly some involve conduct and not speech, and the ones that involve conduct as opposed to speech present no first – But it's not unusual for them to say don't reveal proprietary information. Sure. Is that a First Amendment violation? It can be. It would depend on two issues. One is it's, for some reason, commercial speech, and I haven't really seen case law out there. I can say what Justice Blackmun said in the CBS case, which was a trade secrets case. It was a theft of trade secrets case. And Justice Blackmun said, I understand this is a theft of trade secrets case. There may have been trade secrets stolen here, but that in and of itself is not sufficient to warrant a prior restraint because some economic harm cannot ever just – or he didn't say ever. He said in this case there's not sufficient economic harm to warrant a prior restraint. So that would be the first question. Then there would be a second question as to waiver. Before you're done, you're going to back up to the preliminary issues, right? That's what I was hoping to ask. You started with the last issue. Just can't do it at all. After you identify the – maybe preliminary is the wrong word, but there are other issues on which you could win. That's absolutely correct, Your Honor. You're going to get to them. I would be happy to. Hold on just one second. Victor, would you please add another five minutes? This will be a fulsome discussion with counsel on both sides of this case. I would ask that you address the in concert or participation question. I have concerns about the extent of your client's involvement with the person, Artemis Pyle, who was subject to the consent decree that Judge Sweet had been monitoring for 30 years. My understanding is that Judge Sweet was uncertain about exactly how the relationship came about. As he expressed, but that Artemis Pyle had a 5% interest in the film until after suit was filed. So well after, beginning at the time that your client got notice of the consent order, got a copy of the consent order, you had noticed that there was litigation before then. And then through the following year, basically, while you continued to expend significant sums of money, he had a much closer relationship than is now portrayed. And after suit was filed, his relationship changed to a kind of flat fee. He was getting $2,000 or $2,500 and was portrayed as much more distant. And that concerned me because it did suggest to me that maybe you did act during that period in concert and participation with full knowledge of the terms of the consent decree. And it makes me also wonder about what the future holds if we were to rule in your favor. Could you address that concern? I completely understand that concern because court orders need to be enforced. There's no two ways about it. The facts here were essentially undisputed. It was only a two-day trial. There were only two witnesses.  And he also found that Mr. Pyle did not have any creative control over the movie whatsoever. And he also found that Mr. Pyle, because he had neither the legal right to control the film nor physical possession of the film or any piece of the film or any takes from the film, he could just be dismissed from the case. So this case was never about Mr. Pyle. What Mr. Pyle's participation was, none of this was disputed by Cleopatra and all of this was found by Judge Sweet. Mr. Pyle provided information to the defendants. Mr. Pyle was asked questions. Is this the costume? Is this how the actors sounded? Is this what the actors would have said? Is this how the music sounded? He was asked all sorts of factual questions to allow the writer and director, Jared Cohn, to have as rich a basis of information as possible to make all the creative decisions about the film. But he was bound under the consent order, that we might dispute what a good idea this was, that he could use his own life story, but he was bound not to use biographical material even with respect to other participants in the consent decree. And even though he didn't write the film, surely he participated in the discussion of the accident and I gather the film portrays times leading up to that accident that might be construed to be biographical material of other individuals in the band. Why isn't that enough to constitute concert participation? Sure. Simply providing factual information, which is protected under the First Amendment, both Mr. Pyle's right to give the information and frankly, Cleopatra's constitutional right to receive the information, and we cite cases in that point on the briefs, cannot constitute concerted action. There's nothing about Rule 65 that can modify the First Amendment or limit the First Amendment in any way. And I would take a simple hypothetical. Imagine Mr. Pyle wrote a 500-word essay and he called it the history of the Leonard Skinner band and imagine it was exactly the worst case scenario under the consent decree. I think the consent decree is completely unclear. I think it's virtually impossible to tell whether most movies such as ours would run afoul of the consent decree, but let's just assume for a second this article were unequivocally in violation of the consent decree. And let's say he hands it over to the New York Times. This court could not enjoin the New York Times from publishing that article, even if it were written 100% by Mr. Pyle. And that's the point of the Pentagon Papers case. In the Pentagon Papers case, the New York Times and Washington Post were free to write whatever they wanted. What if he comes to you with that essay and says, listen, I'm subject to this consent decree, so I can't do this, but I really want you to make this film. And you might not be able to pay me up front, but you can pay me later. I'm going to give you all the details and all the good stuff. And so here, make a film. Here's great material. Is that okay for him to flaunt the district court's order in that way? Isn't that exactly what the Rule 65 standard is intended to prevent? Again, I think it comes down to the First Amendment, because the Rule 65 cannot trump the First Amendment. And if Mr. Pyle has a right to give that information and Cleopatra has a right to receive that information, then no prior restraint. I'm positing that he doesn't. I mean, he has the right, I guess, to talk about history, is what you're saying. Right. What I'm saying is if you look at the Pentagon Papers case, 100% of the information in that case, came unlawfully. And the same was true in Providence Journal. And the same was true in Procter & Gamble. And the same was true in CBS. In all of those cases, there was a violation of a criminal law or a violation of a court order. And in those cases, 100% of the information came unlawfully. Whereas here, it's only a very small percentage of the information that came unlawfully. And in each and every one of those cases, the court said, this is not even a close case. No prior restraint is permitted. You're basically saying we should just let the First Amendment trumps the consent decree and the court's interest in enforcing it. Yes, that's exactly what I'm saying. What came unlawfully? In this case? Well, if anything was unlawful, and we don't concede that it was, of course, Mr. Pyle's... So, in our opinion, the consent order is hopelessly vague. It permits him to tell... Well, if it violated the consent decree, it came unlawfully. And if it didn't violate the consent decree, it came unlawfully. And I was going to explain why, in this case, we don't think it came unlawfully. Well, precisely. The consent decree explicitly permits him to make a movie about his life story. The consent decree has another provision, which suggests that he can't write a story about Leonard Skinner, but in the context of his own life, he's allowed to talk about Leonard Skinner. Unlawfully means violating the decree. That's the only law that's at issue here, yes. You spend a little bit on whether it violates the consent decree at all. Yes. And I don't think it does violate the consent decree at all. Is that because you think it is a story of Mr. Pyle, or because it's not a story about Leonard Skinner, or some other reason? I'm trying to give you three choices. It is a story about Mr. Pyle, is why. Of his life? Not of his whole life, but of parts of his life. Any part of his life other than his being involved in a plane crash? Oh, absolutely. The film talks about when he started getting into music and he auditions with a band. The film talks about his relationship with his wife, particularly when he's returning from his road trips. Judge Sweet didn't see the movie, and of course, this court has an obligation to make an independent assessment when it comes to First Amendment issues and cannot defer to any of the factual findings of Judge Sweet. But for the most part, with respect to many of Judge Sweet's findings, we don't actually disagree. We don't go out and hold our own separate fact-finding hearing. I agree. We're not proposing a trial before Your Honor, though I'm sure we would all enjoy it. Well, he said it was a film about Leonard Skinner. Are you saying that's a fact-finding that we can reject only if it's clearly erroneous, or is that an interpretation that is not entirely fact-based? Well, under this Court's decision in Giles v. Marano, 461 F. 3rd, 324, 2nd Circuit, 2006, this Court said, but because this appeal concerns allegations of abridgment of free speech rights, we do not defer to the District Court's findings of fact. So this Court has held that it has to make an independent factual determination on each issue. Because of the First Amendment overlay? Yes. Did he find it? Is that his only statement, a film about Leonard Skinner? Is that his only finding that it does violate, or was he more specific than that? I believe that was the only finding. It's supported by the script, right? I mean, the script says, and Artemis, the real Artemis, reads this, right? The story's about more than a plane crash. It's about the music of Leonard Skinner, the greatest Southern rock and roll band of all time. It's to our musical achievements and to the genius of Ronnie Van Zandt. Yeah, I don't remember whether that quote comes before or after Cleopatra had received the consent decree. There were some articles before the consent decree and some articles after the consent decree. I'm reading from the script. Oh, that's from the script. Yeah, I don't believe, you know, none of us had the benefit of seeing the actual movie, and I know there's significant portions of the script that are not making it into the movie, so I have no idea if that is a portion that is making it into the movie or not. But the fact that the movie talks about Leonard Skinner, which we don't dispute, is explicitly permitted by the consent decree. So the movie doesn't have the full script that we have in the record? The movie, Your Honor, has, I believe, roughly 18 versions of the script, all of which are in the record, all of which we introduced at trial. Filming was complete prior to the trial. Was editing complete? No, no, editing was not complete. At your point, we don't know what portions of these are in and out and what's going to be released publicly? That's exactly right, Your Honor. Is the issue whether the movie violates it or whether any of these scripts violate the consent decree? Well, the scripts aren't being exhibited to anyone outside of this case, so the scripts could not possibly run afoul of the consent decree. The issue is whether the movie violates it. Yes. And we don't have the movie? No, the movie was not a trial exhibit. There really was no movie at the time of the trial. There was filming that was done, but that filming was not edited into something that I or the typical viewer would recognize as a movie. There was just a lot of footage. What's the injunction bar? The movie or those edited or what? The injunction bar is the movie. The injunction bar is any of the footage from the movie ever being— How can we deal with an injunction that bars the movie that we don't have in the record? How do we know what the injunction bars? Well, the injunction is so broad that it bars not just the movie itself but any of the footage created during the filming of the movie, and the movie bars us from ever working in any way with Mr. Pyle in the future. No, the injunction bars you. Excuse me. Thank you, Your Honor. The injunction bars us from working with Mr. Pyle in any way again in the future. So the injunction is much, much broader than the film itself. And I don't—you know, on the First Amendment issue, I don't think it's a close question. I don't think Your Honors need to see the movie to reject the prior restraint. The movie could say anything, and it would still violate the First Amendment, in our opinion. Unlike you, who didn't want to start with the constitutional question but wanted to start a little more attentively with whether the decree had been violated. Don't you think we'd have to see the thing being enjoined? Yes, I don't think—yes, I think that's right. But I guess I would also say they could have— And you say there is a copy of the film, or there is not? There is a rough—what's called a—there's a sort of a rough version of the film, which I understand to be something like a draft of a legal brief. It's not the final, but it's— That's as far along as the film has progressed to date. Is that fair to say? Correct, Your Honor. Don't you think that parties could agree to put that—supplement the record with that—was it a DVD? We could—I would have to consult with my client about that. I mean, it's their case, and the burden is on them. And if they fail to show the movie violates the consent decree, then I think the case is over. They don't really get a do-over because they didn't introduce the— They get a do-over. You're the one telling us that we ought to undo the judgment. And I'm just wondering if we can do what you want without having the latest version of the film. Well, if that's the court's preference, I'm sure my client would consent to that. Well, don't take it from me. The panel will advise you whether that's the panel's preference. I'm just raising a question. I understand. Just one brief question. Judge Sweet imposed an adverse inference sanction related to the phone text. Have you appealed that? We have not. Thank you. And the only other thing I will just say is with respect to the nominative fair use issue, which I think is a very, very serious issue that can be lost in the papers, under the trademark laws, if you own a trademark in Leonard Skinner, you can't stop someone from making a movie about Leonard Skinner, talking about Leonard Skinner, talking about all the events that happened to Leonard Skinner. And that is because under this court's decisions on fair use in the Ninth Circuit's decision in the New Kids on the Block case, the First Amendment has a carve-out from trademark law, and Congress can't prohibit people from telling a story about an event merely because there's some intellectual property right involved in that event. As long as you're using the trademark to describe something, it's totally permitted. And here, Cleopatra certainly has that same right. If Congress can't pass a law prohibiting people from making a film about something merely because it's trademarked, then certainly a series of private musicians can't form a compact with each other, turn that compact into a court order, and then use that court order to force, to prohibit people from doing things that even Congress can't prohibit things from doing. And I would just like to address very briefly the waiver issue. In footnote 25, Judge Sweet states the correct standard for waiver of a constitutional right. There's four things you have to show. The first is that the waiving party had a lawyer. The second is that the terms of that contract were actually negotiated. The third is that the parties had equal bargaining power. And the fourth is that the waiving party had negotiated other contracts in the past. And the waiver has to be shown by clear and convincing evidence. Despite having cited the correct standard, Judge Sweet did not apply that standard at all. He simply said he looked at only one of those factors, which is that Mr. Pyle had an attorney at the time. The fact is there was an equal bargaining position. The fact is there's no evidence in the record whatsoever that Mr. Pyle negotiated the terms of this contract or other contracts in the past. If there's no further questions, thank you. You said there are many versions of the transcript. Will you say 17 or 18? Of the script, yes, Your Honor. Approximately 18, I believe. I reveal no secret when I say I have not read all of them. Are there material differences among them that would affect a ruling on whether the movie or its script violates the decree? I don't think so. If we took any one, we could make a decision based on any one. Well, you'd want to take the final one that was used to actually film. I can look that up and get back to you on that, but I'll get you that on rebuttal, Your Honor. Thank you. Thank you. Thank you, Mr. Mandel. Mr. Haddad? 20 minutes to start, and we're not honoring the clock too much on this case, or at all. Mr. Haddad, good morning, or good afternoon. It's still morning. Good morning. Yes, good morning. Thank you, and may it please the Court, Richard Haddad from Atterberg for the plaintiffs' appellees. The judgment should be affirmed because, as a matter of adjudicated fact, Cleopatra knowingly and willfully worked, in concert and participation with Artemis Pyle, to violate a consent decree that Cleopatra had in its hands, which it read, which it discussed with its counsel, and which it understood. And they had that decree in their hands in order of this Court, or excuse me, in order of the District Court. They had that order in its hands before a word of script was written, before a frame of film was shot, before an actor was hired, and before more than a de minimis amount of money was spent. Now, that consent decree was a commercially negotiated agreement that terminated litigation. It was signed by Mr. Pyle in this very courthouse. And it was signed by parties represented by sophisticated counsel. And that's what's going to distinguish this case from a lot of the other First Amendment cases that counsel was referring to both in his briefs and here. This is not a question of national security or the Pentagon Papers or a ban on speech or a gag order. What this is, is it's a hard-fought, it's a carefully crafted mechanism that was negotiated to settle a dispute, to allocate and develop valuable commercial rights regarding the very subject matter of the underlying litigation. Who among the parties may do what? Which permissions are needed to do what? Who can protect and how would the founders' interests in this valuable commercial property be protected? And it worked for 30 years, and they all made millions, including Mr. Pyle, who gets a check every month of his day based upon the contract that was negotiated and signed in this courthouse. It's not a gag order. It's not a ban on speech. No one's prevented from saying anything. Nothing impacts the news or the press. Well, they were certainly restricted from saying anything. They can't show a movie. Well, they could have made a movie that did not require them working for a year in concert and participation with Mr. Pyle. And that's, I think, I'm sorry. They can't show this movie. It's not a ban on speech. It's really not quite right. Well, it's not a ban on broad speech in the abstract. It may be a permissible ban on speech, but to tell us it's not a ban on speech when it bans a movie is a little extreme. Well, I don't think it's extreme. You may be right. They're entitled to ban the distribution of this movie. But if you start by saying it doesn't ban speech, you get my attention. Okay. Well, I'm glad I got your attention. It bans. Hostile words. It does prevent the distribution of this film because it was prepared in concert and participation with Mr. Pyle knowingly and willingly. It's not just occasional questions that were asked of Mr. Pyle. How does it violate the decree? It violates the decree because it tells, in whole or in part, the story of Lynyrd Skynyrd. It violates the decree because it depicts the individuals, Gaines and Ronnie Van Zandt, without the consent of the estates of Gaines and Ronnie Van Zandt. How many pages? I'm looking at the transcript. Let's see. This is Exhibit 6. I hope it's fairly typical. It starts on page A1578 of the appendix. And although it does have that line, this story is more than about a plane crash. The title is The Story of the Lynyrd Skynyrd Plane Crash. It does. And would you make an estimate how many pages or what percent are devoted to the plane crash? Approximately, I'd say about 25-35% is the plane crash, and the rest is the story of Lynyrd Skynyrd. And that... 25%? Well, I mean, of the time... The plane crash and the people walking away from it and the bloody shirt and the... In other words, how the plane took off, how the plane went down, how the people walked away from it. What percent is devoted to that conjury of facts? I mean, we could count the pages, but probably about half. And the rest is what Artemis Pyle testified was, quote, a compression of our life as a band. Right. Now, he gets to tell about his life, right? He can tell his life story. And the testimony, the evidence that was presented was the testimony of Mr. Pereira, the Cleopatra witness. And he said this is not the life story of Artemis Pyle. So the evidence is that it is not an autobiography. The evidence is it's not Mr. Pyle's life story, but is instead, as the court found, having reviewed the tremendous amount of record, having heard there were two live witnesses, five deposition transcripts, witnesses, volumes of documentary evidence, and, of course, there was destroyed evidence as to which there is an adverse inference. But having found, having seen all of that, the court made a factual conclusion that this is, in essence, a story about Lynyrd Skynyrd. And that's precisely. Would it be your position that if the script were the same, but the evidence showed that Cleopatra had this idea, started to prepare for the movie, sent one of their writers to interview Mr. Pyle, who did so and came home and then went ahead and made the movie and learned about the consent decree from news reports from the time, if they were doing their research, for example, although I guess it was under seal for some time, right? So if they were, if Mr. Pyle said there's actually a consent decree, that, but that was the extent of Mr. Pyle's involvement. Would Cleopatra then be precluded from publishing this movie? That's a very different factual scenario than we have here. I realize, but that's why I'm asking. That may not, I don't know that that would necessarily violate this consent decree, because we need to have knowledge which these parties had, and then we look at what were the factual findings of the collaboration of the activists. But I'm looking here, I mean, he had the right still. I just, the way you're presenting it suggested to me that once they had knowledge of a consent decree, that they were restricted in their right to publish a historical account of the band and the crash. I don't think we need to make that go to that extreme. And they were not then also prohibited in their historical research from just talking with Mr. Pyle, if they didn't pay him and he had no interest in the film. Is that right? Yes. I mean, here are the, this is seven folks, seven people that signed on to this consent decree. I know, but Cleopatra did not sign on. Cleopatra did not. So I'm looking for what makes it in concert or participation with Mr. Pyle that subjects them, in your view, to the consent order, because they were not bound by the consent order, and mere knowledge doesn't make them a party to the consent order. I think their acting in concert and participation in the following ways, as a matter of factual findings, establishes the point. And that is, it's more than an interview. It's more than research. Tell me what it is. Sure. They signed a contract that defined Mr. Pyle as the producer of the film. They said, Mr. Pyle, you're going to get 5% of the profits of this film. You're going to be the narrator of this film. You're going to provide Blu-ray bonus footage on this film. You're going to appear as an actor. You're going to edit the drafts of the script. Counsel says he didn't write any of the words of the script. It may be true, but he certainly edited numerous drafts of the script, including a page-by-page review of the script. He took publicity photos for the movie. He vetted and selected the actors. They set him up with a computer to go through and review the actors and select the actors, and they said, it's very important. We want to work with him on the actors. He then went to Los Angeles, and he coached the actors, participated in the filming. He participated in the table read, and then he made more script changes. He then worked with the costume designer. He promoted the film in the press. He promoted the film at his concerts. And what this adds up to, we submit, and as the court found as a matter of fact, is that Pyle and Cleopatra acted in concert and participation to violate the decree because at the time he did all of the activity, possibly other than the first interview, but at the time he did each and every step thereafter. It is a factual finding that Cleopatra, in fact, had the order in his hand. They read it. They understood it. And they concluded, we're not going to abide by it, and we are not going to seek relief from it. He was the only person they interviewed. When Mr. Cohn, the director, testified, he said, gee, I did all the research, Judge Sweet made a fact finding saying that's not credible. You lack credibility on that statement. I thought he referred to materials that he actually had consulted, and that was shown in the record. No, they said there were some receipts or something, but he said he did other independent research. The judge was not impressed with the testimony of Mr. Cohn, and that Mr. Cohn is the person who, in fact, deleted all of the text messages. So I think it's a reasonable inference, and they're not appealing from the adverse inference decision based upon the deletion of those text messages. But what happened here, and we see this, is that after the lawsuit was filed, as Your Honor indicated in your questioning earlier, after the lawsuit was filed, they then said, let's change our contract. Let's say you're not really the producer. Let's say all you were was a historical consultant, and let's say that that was our deal at the beginning. Well, the evidence came out that that was all fabricated. And they then said — a new document was prepared. It's in the record at 2384, following an urgent text on 2383, the day before the papers were due on the preliminary injunction, saying, I need you to sign this right away. It's urgent, bro. Sign this. We're changing it, and we're saying, falsely, not just amended, we are falsely stating in that document that a year ago our agreement was only to be a historical consultant. Well, that's a false document that was created after this lawsuit was filed. And after we asked for Mr. Cohen's deposition, he then deleted all the text messages that we think would have shown even more instances of collaboration than the ones I just detailed to you. Do you mind me asking why Mr. Pyle was dismissed from the suit? Because at the time of the trial, all of Pyle's work was done. In other words, there was nothing more to enjoin him from with respect to this movie because the many different things that I just indicated to you were completed. He's not the editing guy. So there was nothing further to — there was nothing further for him to do. You didn't want to stop him from touting the film at his concerts and various other venues? I believe that we would have, but the film has been enjoined, so I don't think that makes much of a difference. He had been touting the film and touting his role as the producer and writer. That is what he had been touting throughout that. And so what we're looking at here is something far beyond merely an interview, as Your Honor's question — You would say that he was working with Cleopatra really to evade the strictures of the consent? Precisely, because that order — again, it's a commercial order, so the answer is yes. The commercial allocation of those rights was very important to these people. All seven of them all had counsel. In fact, my clients were adversaries 30 years ago, and they came to this arrangement, and it worked for the benefit of all, including Mr. Pyle, for all these years. Well, maybe we could talk about latches then. The defendants argue that they wrote first seeking to be able to examine the consent order. They saw it, I think, in July, and then the suit wasn't filed until the following year, in the spring, after they had expended over a million dollars, and that they had asserted their First Amendment rights to publish the film, to make the film. They had asserted to your clients that they were not bound by the consent decree early in July, soon after they had received a copy of it, and there was a Facebook message sent later in August suggesting that, completely in line with their representations to your client, they were proceeding with the movie. Why was it incumbent upon your client to take action rather than to sit back and let them expend over a million dollars on developing the film? The court considered the latches defense and dismissed it as a matter of fact as well as a matter of law. And to come directly to the question, I think that the temporal order of events, as established by the correspondence, is first they said, we have a First Amendment right. Then they got the consent decree. And thereafter, in August, having gotten the consent decree and being able to read and see that it says, if you wish to exploit these rights, you need the consent of the founders of the band, they sent a Facebook message to Judith Van Zandt, the widow of Ronnie Van Zandt, and they invited her to the Four Seasons Hotel in Los Angeles to talk about the movie. And she said, oh, what role would you like me to have? I'm interested in hearing what you have to say. And they got together, Cleopatra and its lawyer, and they said, we're not going to respond to her. Radio silence. We will not answer her question. I think that would be concerning from your client's point of view, particularly when it followed the earlier demand in July. We hereby demand you immediately cease and desist from production of the motion picture and that you confirm to us in writing promptly that you will do so. Did you ever get such a writing? No. In fact, what happened is we got the Facebook message. We heard nothing further. And the evidence showed that over the years, Pyle had gone off and tried to do various projects on his own, and if we felt that they were going to violate the consent decree, letters would be sent, maybe responses would be obtained, and nothing would happen. Because Pyle was a fellow who put the band in 1991. You weren't dealing with Pyle here. And we were always dealing with Pyle and whoever he was working with at the time, because he's just the guy who then, we heard nothing further from him. And that was consistent with what had occurred. And what Judge Sweet found is it was not unreasonable here. She found that, made that finding as a matter of fact. It was not unreasonable here for the conduct of the plaintiffs. It was, they did not establish, the party asserting the laches, did not establish that any delay was not unreasonable. And on top of that, as a— Are we to understand still that you demanded a confirmation in writing promptly that you will cease? And that never came. And to the contrary, there was further correspondence consistent with the understanding that Cleopatra was going forward to make the film, and then inquiring a month later whether Van Sant wanted to participate. Why is that consistent with an understanding that they're not making the film? It's consistent with everything in history that they've had with Mr. Pyle and whoever he was working with up until that point. And here Judge Sweet found that it was not any attempt by the plaintiff to lie in the bushes and then pounce later. But he found that it was perhaps at best because of a reasonable misunderstanding as to whether further action was needed to halt the production, and citing cases in which years had gone by without any further conduct. And in this instance, there was a factual finding, and there was evidence that was presented, that showed that these people got together and intentionally and willfully decided not to respond to Ms. Ginesse's claim. Precisely, we submit, to lull them into not seeking injunctive relief, lying, going below the radar— The burden is on you. Well, if they're arguing laches, it's an equitable defense. They have to come to court with clean hands and good faith. And there was a wealth of findings in Judge Sweet's opinion, as a matter of fact, that these parties, that Cleopatra in particular, did not come to court with good hands or acting in good faith. In fact, Judge Sweet made the exact opposite finding and said, I find you did not act in good faith. And under those circumstances, you can't come in and assert laches as an equitable defense in this conduct, in this situation, because the situation is one precisely of your own creation. But Judge Sweet also concluded that Cleopatra didn't suffer prejudice from the delay, and yet there was a million dollars expended. How do we understand that? We understand that because that was at their risk. When you have a court order in your hands, and you know it bars you from doing something, and they had it, and they knew it. It bars you from acting in concert and participation with them from doing precisely what you're doing. If you want relief from that order, you can't just violate the order. You come back to court and you say, I don't think this applies to me. I think it's overbroad. I think any number of things. You don't go ahead and say, I'm just going to spend a million dollars and then see what happens. That's a risk that they undertook. It's a risk that they undertook knowingly, willingly, and as Judge Sweet found, their conduct was in bad faith throughout the process, from the communications with Ms. Van Danen in August, running right through until after we started the lawsuit and the destruction of evidence about the level of collaboration that they had undertaken. Mr. Panetta, I want to come back to the issue of whether either the movie or the scripts violate the decree. You quoted the district judge, I think, if I heard you right, as saying he found that it, meaning either the movie or the script, is about Leonard Skinner. Is that the finding you referred to? Yes. The film is, in essence, the film of. Did he ever find that the movie or the script is about the life of Leonard Skinner? He says that it was, in essence, the film tells the story of Leonard Skinner. Well, now you say in essence. Can you tell me precisely what he found? The film is over, at page 17 of the decision, Judge Sweet found that the film is overall, quote, a film about Leonard Skinner, unquote. About him? Yes. Did he ever expand on that to say it was about his life or his history? Well, he says that then it tells a, quote, portion of the band's history, unquote. A portion? Yes, and that's within the scope of the consent decree. But Ronnie Van Zant, the individual, the lovely singer, Leonard Skinner was just the name of the band, correct? Leonard Skinner is the name of the band, and what paragraph four of the consent decree, page 41 of the record, paragraph four says, there shall be no exploitation, which is commercial exploitation, there shall be no exploitation in whole or in part of the history of the Leonard Skinner band without the prior written consent of its founders. Now, is anyone bound by this decree or acting in concert with anyone so bound prevented from making a film about the plane crash? Anyone who is acting in concert with a signatory to this agreement is, I would say, is barred from doing that because that is in part the history of the Leonard Skinner band. But what we have here is far more than that. So when you say, provided that no such exploitation of the story rights is authorized, which purports to be a history of the band, so if a newspaper called up this gentleman and said, you've got quite a story here, you walked away from a plane crash that killed well-known performers, tell us about it, and we'll pay you 5% of our magazine story to tell us about that plane crash. He can't do that. I think you're now drawing a different scenario from what he can do, because he can ask the question. I asked you, I started by saying, could they do a film or script about the plane crash? And I think you said no. No, not in concert with Mr. Pyle, because, because... The fact that the plane crash is withdrawn from the public domain? No, the fact that the plane crash is not withdrawn from the public domain. In fact, Mr. Pyle... Can I talk to Mr. Pyle about it? You can talk to Mr. Pyle about it. Can you write about it? You can write about it. You pay him? No. As soon as you pay him... That's the line? Because... You print out all the information, you just can't pay him? Because then you're dealing with the commercial exploitation of that story right, which Mr. Pyle willingly, voluntarily, covenanted not to do. And that's the distinction. Because Mr. Pyle has gone on to... The part is the history of the man. The history is fine, Your Honor. Here's the plane crash. The history is fine. Mr. Pyle, Mr. Pyle went on, has been on TV. He spoke to Jake Taffer and he spoke to Howard Stern about that crash. I decree that you can't do the history of John F. Kennedy. That means they can't talk to a survivor or a witness about the assassination. No, that's not... The answer is no, and that's not even close to what we have here. Not even close, Your Honor. You have a plane crash. You have a plane crash. And what you can't do is do a history of Leonard Skinner. No. You can do a history of Leonard Skinner. Other people can make movies about Leonard Skinner. Other people have made movies about Leonard Skinner. And people have spoken to Artemis Pyle about the plane crash. On TV, on the radio. He's allowed to speak. What he can't do is commercially exploit that because that's the bargain. You said exploit that. Exploit that. That that is the history of the band in whole or in part, or tell the story of Leonard Skinner. I'm looking at paragraphs 4 and 5 of the, 3, 4, and 5 of the consent decree that specifically talk about the kinds of things you can't do commercially. Paragraph 3 of the consent decree says, in such connection each of the foregoing, meaning this fellow, can have the right to refer to Leonard Skinner and related matters and describe and portray his experiences with him. How can you describe the plane crash without describing their experiences with him? Because you must purport, you have to, the paragraph continues with a provided, end of paragraph 3, provided. Provided you don't tell his history. As opposed to the life story of the applicable individual. This is not. The doctor says, you've got an interesting story here. There's this plane crash. People were killed. People walked away. It's a terrific story. We want to film it. Can't they do that? You say no. I say not in concert with Pyle because several reasons. Number one, this is not Pyle's life story. And there was evidence about this. Well, that's the only provision that he can use this. But if it is about the plane crash and not the history of Leonard Skinner, then nothing in the injunction in that decree prohibits it. Well, no, because we need also to look at paragraph 4 of the agreement, which further provides that there's no exploitation in whole or in part of the Leonard Skinner band. And what this film is, looking at any one of the 18 versions of the script, paragraph 4, there shall be no exploitation in whole or in part of the history of the Leonard Skinner band. You left out the word history. I might say the history of the Leonard Skinner band. Are you saying so if they, since the air crash is one of the biggest, if not the critical episode of their history, that means the history prohibition means they can't do a film of the plane crash? Not in concert with Mr. Pyle. But this film is more than that. Total history means sort of total history. How they got started, their early years, the fame, the reviews, history. Well, it says in whole or in part. And what the testimony from Mr. Pyle was, is that this is a compression of our life as a band. And your earlier question was, well, how many pages of the script related to the crash and how much was the other stuff? And I said, you can look at it and count the pages. Probably 25, 35 if it's the aftermath of walking away, maybe 50%. But other than that, what should we do? I don't think we need to get into that. Precisely because that is the history in whole or in part of the Leonard Skinner band and is a use of the prohibited use in paragraph five, which is the use of the name, the likeness, the portrait, the picture, the biographical material of Ronnie Van Zandt and Mr. Gaines, except under these certain specified conditions. And he violated that as well. And these were very important provisions to the parties to the litigation. If the episode of the crash, in your view, is the history and life of Leonard Skinner, isn't it also the life of Mr. Pyle? Isn't it also the life of Mr. Pyle? In other words, if one episode is enough to make it the life of one guy, isn't it enough to be the life of the other guy? The answer is no, because this agreement says in whole or in part, and a life story is a very specific, and there's evidence in the record, a life story is the story of your life from when you're born to whenever you are in your life. That's your life story. And Mr. Pereira, the head of Cleopatra, testified. He said, we are not making the life story of Artemis Pyle. I want to make the Leonard Skinner movie because that's cool. I don't even want to just make a plane crash movie. I want to make the Leonard Skinner movie. That's the testimony. He just said the life story you would expect would be the beginning, the middle, and the end. And it's not that with respect to Mr. Pyle. But it's not that with respect to Mr. Leonard Skinner either. That's why it violates the order, Your Honor, precisely because it tells the story in part of the history of the Leonard Skinner band, precisely because it uses the name and likeness of Ronnie Van Zandt. Because when these people got together 30 years ago in this courthouse, and they were, Mr. Van Zandt was still a young widow at the time, and they said, we want to figure out a way that we're going to marshal these economic rights. We want to move forward with the rest of our lives because we've gone 10 years not performing, and that may not have worked out too good for all of us. We had a good thing going. How are we going to manage and promote these economic rights? How are we going to manage and allocate these commercial rights? Who's going to have the right to do what? Who's going to call themselves what? Who's going to perform? Who's going to tell the story? And everyone agreed. And everyone had counsel. And everyone signed that agreement. And Mr. Pyle ratified it. Again, though, except for Cleopatra. Cleopatra ends up, the agreement's under seal for 30 years. Cleopatra shows up, and they have what is not a fully developed, was not fully developed in the record exactly what the relationship is. And so, you know, you have to go some steps further. You can't, it doesn't, the consent order doesn't apply to people who didn't sign it initially. You have to have a showing of in concert, their acting in concert participation. But my question for you right now is, so why aren't damages enough? I mean, we favor publication generally. Why aren't, isn't it enough to go forward and then determine an element of damages that reflects Mr. Pyle's participation and the extent to which the consent order was infringed by these activities, and you get paid after the fact. And you've described a deal that's about exploitation. I mean, the line you have drawn is Pyle can talk about the plane crash, but can't be paid for it. So if that's the pivotal point, why aren't damages enough here? Several reasons. First, because that's the agreement that the parties reached in 1988. The agreement the parties reached was we all, among ourselves... The parties. Pyle, but not Cleopatra. Right, so I'll wrap, I'm about to wrap Cleopatra right into that argument. But all of the signatories agreed at the outset, this is the appropriate remedy for a potential breach or an actual breach of this agreement. Because we want to be sure, as we manage these commercial rights for years, that if anyone is going to breach, we're going to be enjoined. And you're going to be enjoined. And then we go and they say, well, how are we going to protect that? And we protect that threefold. We protect that by saying, well, in paragraph 26 of the agreement, Pyle can't implicitly or through inaction or indirectly violate it. And then we also protect it by saying in paragraph 1 that the injunction bars anyone acting in concert and participation. So we're looking at it three ways. I'm sorry. Well, anybody acting in concert. I mean, you need the concert. You need the concert. And they had it from July at least. There was some, the testimony was unclear as to whether they had it in June. Pyle said, I told them about it, but he didn't give it to them. They clearly had it in July before they embarked down this path. They acted in concert. And that's the language of the agreement itself. That's what Federal Rule of Civil Procedure 65 provides. And that's what the Oral Writs Act permits. The Oral Writs Act extends the power of the federal court to enjoin non-parties to the original action who are in a position to frustrate the implementation of an order. They need to have knowledge. They need to know about it because if somebody did not know about this, they can't be held to an injunction. But here, under either the words of the agreement itself, the Federal Rule of Civil Procedure or the Oral Writs Act, you can, in fact, extend the injunction to non-parties who are in a position to frustrate that order, to frustrate that consent decree. And that's precisely the situation that Cleopatra found itself in last summer, summer 2016, when they had this knowledge,  they had a lawyer advising them on it, and they decided we're not going to seek relief from this order. We're going to violate it. We're going to work with Pyle. We know he signed it. We know we're doing this, and we're going to violate it anyway. My understanding, oh, go ahead. I'm sorry. I didn't get to the damage. Your question was about money, and I want to make sure I come right up to that. Well, what we're looking at here is when you have a consent decree, the parties who bargain for the terms of a consent decree are entitled and cease litigating on the basis of that, are entitled to have the decree enforced. This Court has regularly enforced the terms of consent decrees and not saying, oh, it'll just be money damages for its breach, because that's a very important public policy consideration, which is we want to encourage parties to settle, and if they settle and embody that settlement in a judgment or consent decree, we're going to enforce that. And the failing of that, when that judgment's frustrated, the irreparable harm is palpable, and money damages are not sufficient there. The Court also found here that the loss of the control, of the negotiated and agreed control of the name, of the brand, of the reputation, to Mr. Pyle here is neither calculable nor precisely compensable. It's not merely enough to say how much money did Cleopatra make from this movie, because these parties testified, evidence that Mrs. Van Zandt testified to, is protecting the name, the brand, and the reputation among these folks was critical to her willingness to enter into this agreement, because, as I said a few moments ago, these parties were at loggerheads 30 years ago. They now came together, comforted by knowing that these rights won't be exploited without Mrs. Van Zandt's consent and Mr. Rossington's consent. Of course, he didn't trust her at the time either, but now they're both my clients. So, over the 30 years, my understanding was, from what Mr. Pyle told Cleopatra initially, that it had been litigated periodically, or there had been disputes about what it meant and how constraining it was. Is that correct? There was testimony that at a first dinner meeting that he said, there's a legacy of litigation and disputes with the band, and there were. We put in the evidence of that in our exhibits. Maybe you could just refresh my recollection. Sure. Some of our exhibits were the efforts by Pyle to promote himself after he quit the band in 1991. He was calling himself Lynyrd Skynyrd's Artemis Pyle in concert, and that violated the terms of the agreement. He could say it differently. He certainly can say the fact that Artemis Pyle used to play with Lynyrd Skynyrd, but he couldn't hold himself out as still being Lynyrd Skynyrd. He couldn't do other things that he had done. Do we have any indication of the scope of the consent decree? There had been letters. When lay people talk about letters from lawyers, I don't know whether they consider that to be litigation or not. There had not been litigation with Pyle when he quit in 1991. There was various agreements that were signed, including a ratification of this very consent decree. He ratified it again in 19—he ratified it twice after 1988. Did he hold on to enforce this at earlier times? No. I believe that on earlier times there were letters and sort of table pounding and huffing and puffing, but I don't believe it came to litigation with Mr. Pyle on this. But he was on the receiving end of correspondence and altered his plans as a result of that. And so he had said that, the testimony was, at the very outset. Thank you, Mr. Mandel. You've had significant time over the significant time that we've given to you. Sorry, I mean, Mr. Haddad. I know who you meant, Your Honor. Mr. Mandel has reserved three minutes. Thank you. Just in terms of ways to resolve this case without resorting to the First Amendment, I think latches is probably the easiest. There are really two issues with respect to latches. The first is that Judge Sweet did not address the fact that there were three separate communications to the plaintiffs after the cease and desist letter correspondence. So they send the cease and desist letter. Cleopatra responds by saying, we have an absolute First Amendment right to make this film. We reject your cease and desist letter. They claim that they were uncertain after that letter whether we were making the movie or not, and there were three separate communications. Ms. Van Zandt was contacted by Mr. Cohn, the director. Judge Sweet did address that one. But then there were two others. Mr. Pyle reached out to the plaintiff's management company, and Cleopatra reached out to the plaintiff's management company. Those are discussed on pages A-12-28, A-12-71-72, A-19-82-83. The plaintiffs did not make any effort whatsoever to rebut the fact that those three separate communications all occurred, and Judge Sweet did not address two of those communications. So the plaintiffs were told three separate times after receiving... You need to have clean hands in order to invoke the laches defense, don't you? And we have the sanction here for the destruction of text messages and so on. You're on notice. You changed the terms of your engagement with Mr. Pyle after suit was filed and not promptly upon notice of the consent order. Why should we find that you're entitled to invoke a laches defense? So what the case law says is that in this context, unclean hands means that you are trying to mislead consumers. It's not some general concept of unclean hands. It's I'm using someone's intellectual property in a way that I'm not supposed to be using it, and I'm doing it for the purpose and effect of misleading consumers. There was absolutely no allegation in this case whatsoever that Cleopatra ever misled or attempted to mislead. You're talking in the Lanham Act context, because laches is a broader equitable defense. That is true, but they cite the Lanham Act cases, and when you look at those Lanham Act cases, how unclean hands is defined as trying to mislead consumers. And the fact is everything we said to consumers was true. When we said we were working, you know, before we received the consent decree and we announced that we were working with Mr. Pyle on the movie, that was 100% true. We never said Leonard Skinner is sponsoring this movie. We never said this is an authorized movie. All we said was Mr. Pyle is a key eyewitness to this event, and we're using him as a critical participant in the making of this film. So I would also say there was no destruction of e-mails. There was no finding of a destruction of e-mails. Mr. Cohn, a third party... What happened there was Mr. Cohn, who was a third party, who was the director of the film, he's not an employee of Cleopatra, he got a new phone, and he failed to, when he switched phones, he failed to obtain, he failed to back up the text messages in the old phones, so the text messages were lost. But that is a very different thing from an intentional destruction of text messages. So I don't think, respectfully, there's any argument that Cleopatra had at any time unclean hands. Cleopatra's sole motive in this entire situation was to make a movie about an event that it thought it's a record label that music fans would really enjoy seeing a movie about. The second point about latches is the New Era case. In New Era, the plaintiff was uncertain as to whether the defendant's book contained the prohibited material or did not contain the prohibited material. So to the extent they're arguing that, well, we didn't know if they were continuing to make the movie or not, this court completely rejected that in the New Era case as an argument that can get you around latches. And second, they completely misconstrued what both Judge Sweet and the plaintiffs, respectfully, I believe, misconstrued the whole point of New Era's ruling with respect to prejudice. In New Era, they received the cease and desist letter, then the defendant invested all this money in making the book, and then the plaintiff sued at the 11th hour, and this court said that's prejudice. They continued to invest all this money in making the book after they received the cease and desist letter. That's precisely what happened in this case. So when they say there can't be latches here, there can't be prejudice here, because you received the cease and desist letter before you invested the bulk of the money,  I think there's two other grounds other than latches which the court can very easily decide this case. The court had to determine that an injunction was in the public interest before it issued it under the Supreme Court's decision in eBay, and it unequivocally did not do that. It's undisputed that it did not do that, and there was no serious, and because this court would have to conduct an independent review, there's no reason for a remand. I think this court can just very easily determine prohibiting the viewers from seeing this film is not in the public interest at the end of the day. Whatever narrow intellectual property right the plaintiffs think they have, it cannot possibly be greater than the public's interest in viewing the film. And I think the third very, very simple way to deal with this case without reaching the First Amendment issue is to simply look at the irreparable harm issue. This is the most thin case for irreparable harm that I think I've ever seen successfully lead to an injunction. Only one of the plaintiffs bothered to testify in the case. The other plaintiffs couldn't even be bothered to show up at the trial. And the grounds on which Judge Sweet reached a conclusion of irreparable harm, one of them, emotional harm, was one that wasn't even argued by the plaintiffs. That's one Judge Sweet decided to raise sua sponte, and we had absolutely no opportunity to address it whatsoever. But he had three prongs for irreparable harm. I think we in our briefs go through very carefully why that could not possibly be right. I promised the court two things. With respect to why the First Amendment works totally differently in the copyright context, that's addressed in the movie studio's amicus brief at footnote 7. It's Eldred v. Ashcroft is the case that they cite. And I believe, I'm not certain, I believe that the most current version of the script begins at page A-1978. Excuse me, excuse me, 1578? A-1578. I'm not sure about that. If I get back to my office and learn that I'm wrong about that, should I correct that in a letter to the court? And then there's just three factual statements. Oh, perfect. Then there's just two factual statements that were made that I would like to clear up the record on. Once, the moment, it's undisputed, and Judge Sweet found that the moment we received the consent decree, we stopped publicly describing Mr. Pyle as a writer or producer of the film in any way. We said that we were interviewing for him for the film. So they make a huge deal out of the fact that the change in his role was not papered until after this case was filed. They're right about the way in which it was papered. But it is undisputed. And there are articles that are in the record from April 2017, before this case was filed, which are about the movie. And they do not refer to Mr. Pyle as a writer or a director of the film in any way. So it's very clear that before this case was filed, the Cleopatra changed its position with respect to what Mr. Pyle's role was going to be in the film. Also, there was one misstatement. The original contract, the 2016 contract between Cleopatra and Mr. Pyle, does not identify him as a producer in any way. It states that he will receive a credit of being a consultant or a co-producer. But at no time does it say he's the producer. And if there are any questions, I'm happy to answer them. But the Court's been very patient. Thank you. Thank you both. Helpful arguments, I think. No, we appreciate the time you've spent with us on this. This is a tough case. And we will obviously reserve decision on this and get back to you in due course. So I will ask the Clerk, please, to adjourn Court.